UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL KACOCHA, *individually on behalf of himself and all others similarly situated,*<br><br>          Plaintiff,<br><br>   -v-<br><br>NESTLE PURINA PETCARE COMPANY,<br><br>          Defendant. | Case No. 15-CV-5489 (KMK)<br><br><u>OPINION & ORDER</u> |

<u>Appearances</u>:

Robert J. Berg, Esq.
Jeffrey I. Carton, Esq.
Denlea & Carton LLP
White Plains, NY
*Counsel for Plaintiff*

Henninger S. Bullock, Esq.
Carmine R. Zarlenga, Esq.
Keri E. Borders, Esq.
Rebecca B. Johns, Esq.
Mayer Brown LLP[1]
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

     Plaintiff Paul Kacocha ("Plaintiff") brings this action under § 349 of the New York

General Business Law ("G.B.L.") against Defendant Nestlé Purina Petcare Company, Inc.

("Defendant") on behalf of himself and a putative class of New York consumers who purchased

certain of Defendant's dog treat products alleged to have been deceptively marketed to create the

---

[1] The Clerk of Court is respectfully directed to update the docket to reflect that Mr. Zarlenga is an attorney with Mayer Brown LLP, not Howrey LLP.

impression that they were predominantly made out of bacon.  For the reasons that follow, the

Court grants Defendant's Motion to Dismiss in part, and denies it in part.

## I.  Background

### A.  Factual Background

#### 1.  Defendant's Products and Purchase by Plaintiff and Putative Class Members

The following facts are taken from Plaintiff's Complaint and, for purposes of this

Motion, are considered true.  Defendant is a Missouri corporation that manufactures, markets,

and sells pet foods, pet treats, and related products worldwide.  (Compl. ¶ 10 (Dkt. No. 1).)  A

subsidiary of Nestlé S.A., the largest food company in the world, Defendant is the largest pet

food company in the United States, boasting a 33% market share.  (*Id.*)  Defendant sells a line of

"Beggin' dog treat products," (the "Products"), which are premium-priced dog treats available in

a number of flavors.  (*Id.* ¶ 11.) [2]  Defendant's Products are sold in New York and nationwide at

a variety of leading supermarkets, pet stores, and other retailers, including Walmart, Petco,

Target, and PetSmart.  (*Id.* ¶ 12.)  Additionally, the Products are sold online directly by such

retailers as Amazon.com, Walmart.com, Target.com, and Walgreens.com.  (*Id.*)

According to Plaintiff, Defendant "aggressively" markets the Products and has a popular,

long-running, national television commercial campaign that "feature[s] comical videos of dogs

---

[2] These flavors are "Beggin' Strips Bacon Flavor," "Beggin' Strips Bacon & Cheese
Flavors," "Beggin' Strips Bacon & Beef Flavors," "Beggin' Strips Applewood Smoked Flavor,"
"Beggin' Strips Thick Cut Hickory Smoked Flavor," "Beggin' Strips Thick Cut Maple Flavor,"
"Beggin' Strips Little Bacon Flavor," "Beggin' Collisions Bacon & BBQ Pork Flavors,"
"Beggin' Collisions Bacon, Egg & Cheese Flavors," "Beggin' Strips Bacon & Peanut Butter
Flavors," "Beggin' Collisions Bacon & Ranch Flavors," and "Beggin' Party Poppers Bacon and
Cheese Flavors."  (Compl. ¶ 11.)

In an act of judicial restraint, the Court declines to invoke in this Opinion the phrase
"where's the beef?", the expression "when pigs fly," or the works of seventeenth-century English
jurist Sir Francis Bacon, although not for want of opportunity.

enthusiastically musing about their strong desire for bacon and" the Products.  (*Id.* ¶ 13.)[3]
According to Plaintiff, these commercials suggest that the Products are made primarily of bacon
and have bacon as their main ingredient, when, in actuality, the real main ingredients are "non-
meat fillers," specifically, "ground wheat, corn gluten meal, wheat flour, water, ground yellow
corn, sugar, glycerin, soybean meal, and hydrogenated corn syrup, plus at least five artificial
preservatives."  (*Id.*; *see also id.* ¶¶ 15, 37–38.)  In contrast, bacon and bacon-fat, according to
Plaintiff, are present in only "tiny quantities," and are the tenth and twelfth ingredients in
Beggin' Strips Original Bacon Flavor Product.  (*Id.* ¶ 13; *see also id.* ¶¶ 15, 37.)  In addition,
according to Plaintiff, Defendant, on the Products' webpage, lists under the heading "Ingredients
& Nutrients" the phrase "[m]ade with real bacon," without specifying any other ingredients or
nutrients.  (*Id.* ¶ 11.)

 Additionally, the Products' packaging allegedly further reinforces the notion that the
Products consist largely of real bacon, when, in fact, the Products consist largely of processed
wheat, corn, soy, and water.  (*See id.* ¶¶ 16–17, 20.)[4]  Although Plaintiff indicates that all the
Products bear the same type of false and misleading packaging, as an example, Plaintiff points to

---

[3] Plaintiff provides a thorough description of one such commercial, noting, among other
things, that the word "beggin'," when spoken in the commercial, sounds like "bacon," and that
the concluding voiceover says, "Beggin' Strips, [m]ade with real bacon.  There's no time like
Beggin' time!"  (Compl. ¶ 14.)  The commercial can be viewed at:
https://www.ispot.tv/ad/7IFX/purina-beggin-strips-beggin-time.

[4] According to Plaintiff, Defendant's "false and misleading message" can be found on the
packages' "Principal Display Panel," as defined at 21 C.F.R. § 101.1.  Of course, whether a
given portion of Plaintiff's packaging is false within the meaning of that regulation is a legal
conclusion which this Court need not presume true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 681
(2009) (noting that "the conclusory nature of [the plaintiff's] allegations . . . disentitles them to
the presumption of truth").  Accordingly, the Court construes Plaintiff's allegations concerning
the "PDP" somewhat more generally to refer simply to a place of prominence on the front
packaging.

the packaging for the 25-ounce bag of Defendant's Beggin' Strips Original Bacon Flavor

Product.  (*Id.* ¶¶ 17, 21.)  According to Plaintiff, this package shows, among other things, the

phrase "Beggin' Strips" in large letters with the words "Brand Dog Snack" in very small type

below, the weight of the package with the phrase "made with real bacon!" underneath, a picture

of crispy bacon on nearly one half of the package, an icon of a small black frying pan with two

pieces of sizzling bacon resting atop the phrase "bacon flavor," with the phrase "AHH[H],

LOVE AT FIRST SNIFF."  (*Id.* ¶ 17; *see also* Decl. of Keri E. Borders in Supp. of Def.'s Mot.

To Dismiss Pl.'s Compl. ("Borders Decl.") Ex. A (Dkt. No. 24).)  Likewise, Plaintiff stresses

that the back of the package is similarly misleading, featuring a "crazed, outstretched, salivating

dog chasing what looks like a giant crispy strip of bacon," beneath which lies the caption

"BacoNology 101," next to which are an explanation of its meaning and the icon of the black

frying pan containing two strips of crispy bacon.  (*Id.* ¶ 18.)[5]  The back of the package also

contains a set of instructions to consumers to "[f]eed as a treat to your adult dog," followed by

the phrase, "[b]aconologists standing by," flanked by the Purina logo, the purina.com website

address, the Purina call center phone number, and its hours of operation.  (*Id.*)  The bottom left

corner of the packaging contains a "'Guaranteed Analysis'" of the protein, fat, and fiber content

of the product, along with a list of ingredients, arranged in decreasing order of predominance by

weight.  (*Id.*)  Those ingredients are listed, in order, as (1) ground wheat, (2) corn gluten meal,

(3) wheat flour, (4) water, (5) ground yellow corn, (6) sugar, (7) glycerin, (8) soybean meal, (9)

---

[5] The package indicates that BacoNology postulates that:
- "EXCITEMENT = BEGGIN' X SPEED OF SMELL$^2$."
- "WHAT HAPPENS WHEN AN IRRESISTIBLE AROMA MEETS AN IMMOVABLE APPETITE?  **BEGGIN' TIME!**"
- "AN OBJECT IN MOTION STAYS IN MOTION.  CHECK OUT MY TAIL!"

(Compl. ¶ 18.)

hydrogenated corn syrup, (10) bacon (preserved with sodium nitrite), (11) salt, (12) bacon fat (preserved with BHA and citric acid), (13) meat, (14) phosphoric acid, (15) sorbic acid (a preservative), (16) calcium propionate (a preservative), (17) natural and artificial smoke flavors, (18) Red 40, (19) Yellow 5, (20) Blue 1, (21) Yellow 6, and (22) added color. (*Id.* ¶ 19.)[6] With respect to the fourth of these ingredients, Plaintiff alleges that, according to the "Guaranteed Analysis" on the packaging, "moisture" constitutes 26% of the product. (*Id.* ¶ 20.) Finally, Plaintiff alleges that, "once a consumer opens the Beggin' package, she is presented with a product that is cut, shaped, colored, and textured to look like it is real bacon, and the product is flavored to smell just like real bacon." (*Id.* ¶ 21.)

Plaintiff, an adult resident of Dutchess County, New York, alleges that he purchased several bags per year of the Beggin' Strips Bacon Flavor and Beggin' Strips Bacon and Cheese Flavors Products at various New York pet stores for his West Highland terrier, Sophie, as well as her "predecessor," Tyler. (*Id.* ¶ 8.) Over the years, Plaintiff allegedly had been "exposed to and ha[d] seen Defendant's representations by reading the labels of the Beggin' dog treats products, as well as by having viewed some of Defendant's television commercials for the [P]roducts," and that, based on these representations, he was led to believe—and did believe—that the Products he purchased contained real bacon as a primary ingredient. (*Id.* ¶¶ 9, 22.) Indeed, according to Plaintiff, he read and considered the Products' packaging, and based his decision to purchase the Products on that packaging, which was "entirely consistent" with Defendant's nationally-run television ads that he also viewed. (*Id.* ¶ 23.) As a result, he paid a premium price for these products, and Defendant "reaped enormous profits from its false marketing and

---

[6] In his Complaint, Plaintiff groups "calcium propionate (a preservative)" and "natural and artificial smoke flavors" together as the sixteenth ingredient. (Compl. ¶ 19.) The Court assumes that this was a typo, and that they are, in fact, separate ingredients.

sale of the [P]roducts." (*Id.* ¶¶ 22, 26.)  Had he known the truth, he—like the putative class

members—would not have purchased these Products and, in any event, would not have paid that

premium price.  (*See id.* ¶¶ 9, 22–24; 40.)

### 2.  Class Definition and Allegations

In bringing suit on behalf of himself and all other similarly situated consumers in the

State of New York, Plaintiff defines the putative class that he seeks to represent as:

> All consumers who, within the applicable statute of limitations period, purchased
> in the State of New York any of Defendant's Beggin' dog treat products.  Excluded
> from the class are Nestlé, S.A., Nestlé Purina Pet Care Company, their parents,
> subsidiaries, affiliates, officers and directors, and those who purchased Beggin' dog
> treat products for resale.

(*Id.* ¶ 28.)[7]  Additionally, Plaintiff makes a number of allegations with respect to the various

requirements of Federal Rule of Civil Procedure 23, pursuant to which he brings his lawsuit.

(*See id.* ¶¶ 28–35.)[8]  With respect to the numerosity requirement, he alleges that the members of

the class are "so numerous that joinder of all members of the class is impracticable," and that,

while "[t]he precise number of class members is unknown to Plaintiff," he believes that the

proposed class contains thousands of purchasers.  (*Id.* ¶ 29.)  Additionally, with respect to the

issue of the "[e]xistence and [p]redominance of [c]ommon [q]uestions of [l]aw and [f]act,"

Plaintiff identifies several such questions that, in his view, make this case appropriate for class

---

[7] In the paragraph of his Complaint immediately preceding that containing the definition of his proposed class, Plaintiff also alleges that he brings the action "on behalf of himself and all other similarly situated consumers," without limiting the scope of his class to New York consumers.  (Compl. ¶ 27.)  Given that Plaintiff elsewhere refers to the "New York class" he seeks to represent, (Compl. ¶ 7; *see also* Compl. ¶ 36), the Court understands Plaintiff to seek to represent *only* a New York class—not also a national one.

[8] Although Plaintiff does not specify the pertinent subsections of Rule 23, his Complaint makes clear that he seeks both monetary damages and equitable relief.  (*See* Compl. ¶¶ 34–35.)

treatment. (*See id.* ¶ 30.)[9]  Additionally, Plaintiff asserts that his claims are typical of those of the putative class members, inasmuch as he is advancing the same claims and legal theories on behalf of himself and the whole class and because all putative class members were injured through Defendant's uniform misconduct and were subject to Defendant's deceptive representations. (*Id.* ¶ 31.)  Plaintiff will further fairly and adequately protect the interests of the class members, he asserts, because he purchased at least two of the Products—specifically, the Beggin' Strips Bacon Flavor and Beggin' Strips Bacon & Cheese Flavors products—and relied on the deceptive representations made in Defendant's marketing and advertising campaign as well as its labels. (*Id.* ¶ 32.)  Additionally, Plaintiff asserts that he has no interests adverse or antagonistic to those of the class, that he has retained counsel experienced in complex consumer class action litigation, and that he intends to prosecute this action vigorously. (*Id.*)  Finally, Plaintiff asserts that a class action is superior to other methods for the fair and efficient adjudication of this controversy, as the damages suffered by individual class members are

---

[9] Those questions, "include, but are not limited to":

- Whether Defendant made false or misleading representations regarding the contents of the products;
- Whether Defendant represented that the products have significant quantities of ingredients—to wit, real bacon—which they do not have;
- Whether Defendant represented that the products were of a particular standard or quality when they were not;
- Whether the claims made by Defendant regarding the products discussed above are true, or are misleading, or objectively are reasonably likely to deceive;
- Whether the alleged conduct constitutes violations of the law asserted;
- Whether Defendant engaged in false or misleading advertising;
- Whether the class members obtained the benefits that Defendant represented the products have;
- Whether Plaintiff and class members have sustained monetary loss and the proper measure of that loss; and
- Whether, as a result of Defendant's misconduct, the class is entitled to monetary and statutory damages, as well as equitable and injunctive relief.

(Compl. ¶ 30.)

relatively small compared to the burden and expense that would flow from individual litigation

of their claims against Defendant, because it would be "virtually impossible" for a member of the

class, on an individual basis, to obtain effective redress for the wrongs done to him or her, and

because, even if he or she could, the court system could not afford such individualized litigation.

(*Id.* ¶ 33.)  Additionally, Plaintiff alleges, individualized litigation would create the danger of

inconsistent or contradictory judgments arising from the same set of facts.  (*Id.*)  In contrast,

employing a class action procedure "provides the benefits of adjudication of these issues in a

single proceeding, economies of scale, and comprehensive supervision by a single court, and

presents no management difficulties under the circumstances here."  (*Id.*)  To that end, Plaintiff

seeks monetary damages, including statutory damages for the entire class, and equitable relief,

including a class-wide injunction, which, he alleges, is appropriate as Defendant has "acted or

refused to act on grounds generally applicable to the class."  (*See id.* ¶¶ 34–35; *see also id.*

¶¶ 42–43.)

### B.  Procedural History

On July 14, 2015, Plaintiff brought the instant Complaint, (*see* Dkt. No. 1), and, on

September 15, 2015, Defendant submitted a letter requesting a pre-motion conference in advance

of its Motion to Dismiss, (*see* Dkt. No. 12).  The Court held a pre-motion conference on October

13, 2015.  (*See* Dkt. (minute entry for Oct. 13, 2015).)  Defendant filed its Motion and

accompanying papers on November 13, 2015, (*see* Dkt. Nos. 22–24); Plaintiff filed his

Opposition on December 21, 2015, (*see* Dkt. No. 25); and Defendant submitted a reply in

support of its Motion on January 15, 2016, (*see* Dkt. No. 26).  The Court held oral argument on

June 8, 2016.

## II.  Discussion

### A.  Standard of Review

"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are substantively identical." *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (internal quotation marks omitted); *see also Neroni v. Coccoma*, No. 13-CV-1340, 2014 WL 2532482, at *4 (N.D.N.Y. June 5, 2014) (same), *aff'd*, 591 F. App'x 28 (2d Cir. 2015). "In deciding both types of motions, the Court must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff." *Gonzalez*, 2014 WL 2475893, at *2 (internal quotation marks omitted); *see also Seemann v. U.S. Postal Serv.*, No. 11-CV-206, 2012 WL 1999847, at *1 (D. Vt. June 4, 2012) (same).  However, "[o]n a Rule 12(b)(1) motion, . . . the party who invokes the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6)."  *Gonzalez*, 2014 WL 2475893, at *2; *see also Sobel v. Prudenti*, 25 F. Supp. 3d 340, 352 (E.D.N.Y. 2014) ("In contrast to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." (internal quotation marks omitted)).  This allocation of the burden of proof is "[t]he only substantive difference" between the standards of review under these two rules.  *Smith v. St. Luke's Roosevelt Hosp.*, No. 08-CV-4710, 2009 WL 2447754, at *9 n.10 (S.D.N.Y. Aug. 11, 2009), *adopted by* 2009 WL 2878093 (S.D.N.Y. Sept. 2, 2009); *see also Fagan v. U.S. Dist. Court for S. Dist. of N.Y.*, 644 F. Supp. 2d 441, 446–47 & n.7 (S.D.N.Y. 2009) (same).

### 1. Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (internal quotation marks omitted). "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *see also Butler v. Ross*, No. 16-CV-1282, 2016 WL 3264134, at *3 (S.D.N.Y. June 14, 2016). Nevertheless, "[u]nlike Article III standing, which ordinarily should be determined before reaching the merits, statutory standing may be assumed for the purposes of deciding whether the plaintiff otherwise has a viable cause of action." *Coan v. Kaufman*, 457 F.3d 250, 256 (2d Cir. 2006) (citation omitted). While a district court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction," "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (alteration and internal quotation marks omitted); *see also Ray Legal Consulting Grp. v. Gray*, 37 F. Supp. 3d 689, 696 (S.D.N.Y. 2014) ("[W]here subject matter jurisdiction is contested a district court is permitted to consider evidence outside the pleadings, such as affidavits and exhibits.").

### 2.  Rule 12(b)(6)

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alterations, and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and internal quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . . " (internal quotation marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the complaint as true . . . ." (alterations and internal quotation marks omitted)).  Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

B.  Analysis

In its Memorandum of Law, Defendant argues that Plaintiff's complaint must be dismissed because it fails the "reasonable consumer test," because Plaintiff lacks standing, and because the advertisements consist of nonactionable puffery.  (*See generally* Mem. of Law in Supp. of Def.'s Mot. To Dismiss Pl.'s Comp. ("Def.'s Mem.") (Dkt. No. 23).)  "[S]tanding is a threshold matter [that a court] must resolve before reaching the merits," *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 44 (2d Cir. 2015) (internal quotation marks omitted)), and, so, the Court begins there.

1.  Standing

While Defendant makes a number of arguments concerning whether Plaintiff has "standing," (*see* Def.'s Mem. 16–19), not all standing is created equal, and, historically, courts in the Second Circuit have distinguished between Article III, statutory, and class standing, *see, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 481 (S.D.N.Y. 2014)

("[C]ourts in this district have recognized that the Second Circuit considers the questions of Article III, statutory, and class standing as distinct."), *reconsideration denied*, 2014 WL 6488219 (S.D.N.Y. Nov. 18, 2014).  The relevant pecking order is complicated, and, while "Article III standing must be decided before the merits (and hence before statutory standing issues bound up with the merits)," *All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87 (2d Cir. 2006), "under certain circumstances, questions of statutory standing may properly be treated before Article III standing," *In re Facebook, Inc., Initial Pub. Offering Derivative Litig.*, 797 F.3d 148, 155–56 (2d Cir. 2015) (alterations and internal quotation marks omitted), although "class standing is often considered at the class certification stage of the litigation," *Reid v. GMC Skin Care USA Inc.*, No. 15-CV-277, 2016 WL 403497, at *4 (N.D.N.Y. Jan. 15, 2016).  This hierarchy is further complicated by the fact that the Supreme Court has recently raised questions as to the existence of statutory standing, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 & n.4 (2014) (noting that, while the Supreme Court has referred to the exercise of "ask[ing] whether [the plaintiff] has a cause of action under the [relevant] statute" "as 'statutory standing[,]' and [has] treated it as effectively jurisdictional," that term is "misleading, since the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case" (emphasis in original) (internal quotation marks omitted)); *see also Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) ("Because the Supreme Court made clear in *Lexmark* that the 'statutory standing' appellation is 'misleading' and 'a misnomer,' we avoid this appellation going forward." (citation omitted)); *Paulsen v. Remington Lodging & Hosp., LLC*, 773 F.3d 462, 468 (2d Cir. 2014) (noting the same and characterizing *Lexmark* as instructing that "the courts are required to examine the text of the

statute in order to determine whether it has any effect on jurisdiction" (emphasis in original) (citing *Lexmark*, 134 S. Ct. at 1387 n.4, 1388–89)); *Advanced Video Techs., LLC v. HTC Corp.*, 103 F. Supp. 3d 409, 418 (S.D.N.Y. 2015) (concluding that "the Supreme Court recently clarified, [that] prudential or statutory standing is not really 'standing' at all," and, "[a]s a result, no motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) lies where the alleged 'lack of standing' is merely prudential" (citing *Lexmark*, 134 S. Ct. at 1388 n.4)).

Therefore, in resolving Defendant's arguments as to standing, the Court will begin by considering any attacks on Plaintiff's Article III standing before considering whether the remaining arguments need be decided at this early stage. *See, e.g.*, *In re Whole Foods Mkt. Grp., Inc. Overcharging Litig.*, No. 15-CV-5838, 2016 WL 852796, at *5 (S.D.N.Y. Mar. 1, 2016) ("The Court first addresses [Article III] standing, because it is necessary for subject matter jurisdiction.").[10]

_____

[10] Although the Supreme Court has instructed that Article III standing issues may be deferred until after class certification where certification issues are "logically antecedent to Article III concerns," *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) (internal quotation marks omitted), this is an "exception to the usual rule that a court must confirm that it has jurisdiction over a plaintiff at the outset of a case," *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 465 (S.D.N.Y. 2013) (citing *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 197–98 (2d Cir. 2005)), and, thus, "does not apply where, as here, the standing of the *named* plaintiffs is in question," *id.* (emphasis in original) (citing *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 406 (S.D.N.Y. 2011)); *see also In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d at 406 (observing that "[t]he 'logically antecedent' exception is not exactly defined," and that, while "[t]he cases indicate that where 'class certification is the *source* of the potential standing problems,' class certification should precede the standing inquiry," and that "[t]his is particularly true where, as here, Article III concerns pertain to statutory standing," "[c]ases holding otherwise have been situations where the standing of the *named plaintiffs* is in question or where the standing of each plaintiff involves nuances in the conduct affecting each plaintiff." (emphasis in original)). Here, given Defendant plainly attacks Plaintiff's own standing to bring the suit, separate and apart from class considerations, and given that "logical antecedence is only a narrow 'exception' to the rule that Article III standing is a prerequisite to class certification," and one that "applies in cases in

### a.  Article III Standing

To begin with a constitutional truism, "[f]ederal courts are courts of limited jurisdiction." *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (internal quotation marks omitted).  Indeed, "their powers [are] circumscribed at their most basic level by the terms of Article III of the Constitution, which states that they may hear only 'Cases' or 'Controversies.'"  *Russman v. Bd. of Educ.*, 260 F.3d 114, 118 (2d Cir. 2001) (quoting U.S. Const. art. III, § 2, cl. 1).  "[A]t [the] uncontroverted core [of the 'case or controversy' requirement] lies the principle that, at all times, the dispute before the court must be real and live, not feigned, academic, or conjectural."  *Id.*  To police that limitation and avoid judicial mission-creep, binding precedent from the Supreme Court and the Second Circuit insists upon an "'irreducible constitutional minimum' without which a federal court may not proceed to the merits of a claim."  *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  To establish that his claim meets that minimum constitutional threshold, Plaintiff must establish three things: "first, that [he] has sustained an 'injury in fact' which is both 'concrete and particularized' and 'actual or imminent'; second, that the injury was in some sense caused by the opponent's action or omission; and finally, that a favorable resolution of the case is 'likely' to redress the injury."  *Id.* (citations omitted) (quoting *Lujan*, 504 U.S. at 560–61).

"That a suit may be a class action, however, adds nothing to the question of standing"; indeed, "even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class

---

which 'the Article III concerns would arise only if the Court affirmed class certification,'" *Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 986 F. Supp. 2d 412, 419 n.3 (S.D.N.Y. 2013), the Court will not delay consideration of Defendant's Article III arguments for a later day.

to which they belong and which they purport to represent.'" *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975)); *see also Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 432 (S.D.N.Y. 2015) (same). "As such, the relevant legal entity for determining whether Article III standing is proper is the named plaintiff(s), not the proposed class." *Catalano v. BMW of N. Am., LLC*, — F. Supp. 3d —, 2016 WL 844832, at *8 (S.D.N.Y. Mar. 1, 2016).

Regrettably, the extent to which Defendant's arguments attack Plaintiff's *Article III* standing is, at best, murky. On the one hand, Defendant contends that Plaintiff is without Article III standing because the Complaint "lacks plausible allegations of causation, deception, and injury," but, on the other, also insinuates that this is an issue of statutory standing, inasmuch as "New York state law . . . requires plaintiffs to demonstrate, at a minimum, 'actual injury' resulting from their alleged purchases." (Def.'s Mem. 16 (quoting *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000)).) Vaguer still, Defendant also argues that Plaintiff "lacks standing" to sue based on the appearance of the product, Defendant's statements about the product on the Internet, and television advertisements, which, Defendant asserts, Plaintiff never actually alleged that he saw. (*See id.* at 17–19.)[11] By the Court's read, Defendant makes essentially two arguments that may impair the complaint on constitutional grounds—first (and explicit in its invocation of Article III), that Plaintiff lacks standing because he either was not injured at all or was injured by something other than Defendant's actions, in that he read

---

[11] These arguments, however, may well be intended as relating to statutory standing, as the relevant section of Defendant's brief cites (1) *Murray v. Elations Co.*, which dealt with the question of whether the plaintiff had standing under two California statutes, *see* No. 13-CV-2357, 2014 WL 3849911, at *8–9 (S.D. Cal. Aug. 4, 2014), and (2) *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, which concerned whether the Plaintiff had properly alleged causation for purposes of GBL § 349, *see* 8 F. Supp. 3d 467, 480 (S.D.N.Y. 2014) (citing *Gale v. Int'l Bus. Machs. Corp.*, 781 N.Y.S.2d 45, 47 (App. Div. 2004)).

Defendant's Products' label, "including the back panel which includes the ingredient list[] in order of prominence," and that he therefore would have been disabused of the notion that bacon was the primary ingredient in the Product, (*see* Def.'s Mem. 16–17), and, second, that Plaintiff could not have been injured by those aspects of the Products that he did not see, (*see id.* at 16–18).  Both arguments are without merit.

### i.  Injury Despite Plaintiff's Having Read the Labels

Conceptually, Defendant's first argument can be thought of as an attack on Plaintiff's allegations of injury, causation, or both.  (*See* Def.'s Mem. 16 ("[P]laintiff only has standing to pursue his claims if he was *himself* deceived by the labeling of Beggin' Strips.").)

With respect to the former, while Defendant may be skeptical that Plaintiff was, in fact, deceived, there can be little question that he *alleges* sufficient injury for purposes of Article III justiciability.  Indeed, the law is clear that economic injury—including that caused by paying a premium—is sufficient to establish injury for standing purposes.  *See, e.g.*, *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013) ("Even a small financial loss is an injury for purposes of Article III standing."); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, — F. Supp. 3d —, 2016 WL 1241533, at *4 (S.D.N.Y. Mar. 28, 2016) (characterizing "th[e] sort of 'paid too much' or 'received too little' harm" as "classic economic injury-in-fact."); *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, No. 12-MD-2413, 2013 WL 4647512, at *11 (E.D.N.Y. Aug. 29, 2013) ("There is no doubt that [the] plaintiffs have alleged sufficient facts to show that they, individually, have Article III standing . . . . They were injured as a result of those purchases because they paid higher prices than they would have otherwise paid, or not paid at all, for a product that they contend is not, in fact, all natural.").  Here,

Plaintiff alleges that he "paid [a] premium price" that he would not have had he "known the truth." (Compl. ¶ 9.) Therefore, he has adequate injury for purposes of standing.

Defendant's argument thus must shift, if anywhere, to the notion that any injury Plaintiff suffered was not actually *caused* by Defendant's actions. *See Cortlandt St. Recovery Corp.*, 790 F.3d at 417 (noting that, for standing purpose, the "the injury [must be] in some sense caused by the opponent's action or omission"). However, "[t]he 'causal connection' element of Article III standing," which demands something less than proximate causation, "does not create an onerous standard." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016). Thus, Defendant's argument demands too much from the Complaint in this regard. To see why, it is helpful to first break down Defendant's argument a bit: With respect to the Products' packaging, Defendant argues that any conclusion that bacon was the primary ingredient must have been belied by the ingredient list that Plaintiff read, his care in selecting his dog food, and the fact that the packaging for the Beggin' Strips Bacon & Cheese Flavors Product he purchased "includes a block of cheddar and a whimsical flavor." (Def.'s Mem. 16–17.) Likewise, Defendant argues that the advertisements could not have fooled him, because, while "Plaintiff . . . states that he saw 'some' television ads" and "spends ample time describing 'one famous television ad,'" he "never alleges that he himself saw this particular ad prior to purchasing Beggin' Strips." (*Id.* at 18.) Lastly, with respect to the Products themselves, Defendant argues that, "[b]ecause [P]laintiff necessarily must come into possession of the product prior to opening it, he cannot base liability off of what occurred once he opened the Beggin' Strips products." (*Id.* at 18–19.)

Perhaps one day a jury will find these arguments defeat Plaintiff's claim (or it may very well fall at summary judgment); however, for now, they are too much in tension with the Complaint's allegations, which this Court is obligated for the moment to accept as true. *See*

*Gonzalez*, 2014 WL 2475893, at *2 (noting that a court "must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff" under both Rules 12(b)(1) and 12(b)(6)).  With respect to the advertisements and the packaging, Plaintiff clearly alleges that, "[b]ased on the representations contained on the Beggin' product packaging and on the advertisements for the Beggin' dog treat products Plaintiff had viewed, Plaintiff . . . believed[] that the Beggin' dog treat products he purchased contained real bacon as a primary ingredient."  (Compl. ¶ 9.)  Additionally, Plaintiff alleges that, "[h]ad [he]. . . known the truth . . . , [he] would not have purchased the Beggin' dog treat products that he did, and in any event, he would not have paid the premium price he paid."  (*Id.*)  Taken as true, these statements compel the conclusion that, Defendant's incredulity notwithstanding, Plaintiff somehow gleaned from Defendant's packaging and advertisements that the products contained bacon as a "primary ingredient."[12]  Likewise, with respect to the shape and smell of the Products themselves, the Complaint is clear that "Plaintiff purchased several bags of [Defendant's] dog treat [P]roducts per year," (Compl. ¶ 8), and, again, that he would not have purchased the Products had he known the truth, (*id.* ¶ 9).  Even if these allegations do not explicitly assert that the appearance of the strips directly impelled Plaintiff to continue his purchases, they do, at a minimum, insinuate as much and evidently did not disabuse Plaintiff of his view that bacon was the primary ingredient.  If the courts were to demand, as a condition of

---

[12] Defendant might find this proposition hard to believe—or, perhaps, implausible. Indeed, at oral argument, the Court noted that reasonable minds could disagree with Plaintiff's interpretation of the packaging.  The question of what Plaintiff means by "primary ingredient" will no doubt be explored and scrutinized at later stages of this case.  In the meantime, while plausibility is, of course, necessary at the pleading stage, *see Twombly*, 550 U.S. at 557, it is instructive that these allegations are not mere legal conclusions, *cf. Iqbal*, 556 U.S. at 681 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.").

exercising subject matter jurisdiction, that a plaintiff specifically tick off each allegedly

deceptive attribute as a cause of his purchase, the Court struggles to understand how it could then

also claim to apply the same liberal standard for dismissal as under Rule 12(b)(6), *see King v.*

*N.Y.C. Emps. Ret. Sys.*, — F. Supp. 3d —, 2016 WL 3996343, at *11 (E.D.N.Y. July 25, 2016)

("The same standard of review applies to motions to dismiss brought under Rule 12(b)(1) and

Rule 12(b)(6) of the Federal Rules of Civil Procedure."); *cf. Weisblum v. Prophase Labs, Inc.*, 88

F. Supp. 3d 283, 288, 298 (S.D.N.Y. 2015) (concluding on motion to dismiss that, while "[the]

[d]efendants raise colorable questions about the credibility of [certain] allegations insofar as the

insert containing [certain] statements [at issue] was *inside* the package, . . . the [c]ourt is required

to assume the truth of the allegations at this stage of the litigation" (emphasis in original)

(citations omitted)).[13]

---

[13] The question is closer with respect to the "one famous television ad" Plaintiff
describes, inasmuch as Plaintiff's Opposition, rather than confirm that Plaintiff saw the ad prior
to making at least one of his purchases, maintains that "[w]hether [he] had viewed the television
commercial prior to or after his purchases . . . is irrelevant to whether he was misled by this ad,"
(Pl.'s Mem. of Law in Opp'n to Def.'s Mot. To Dismiss Compl. ("Pl.'s Opp'n") 24 (Dkt. No.
25)), thereby leaving open the possibility that, notwithstanding Plaintiff's assertion that he
viewed the ad, (Compl. ¶ 14), Plaintiff viewed this ad only after his tenure as a Beggin' Strips
customer was established. Nevertheless, for standing purposes, Plaintiff's allegations as to
which of Defendant's Products he purchased coupled with allegations as to the sorts of
misrepresentations he relied upon is sufficient at this juncture. *See Hughes v. Ester C Co.*, 930 F.
Supp. 2d 439, 454 (E.D.N.Y. 2013) (rejecting the defendants' argument that the "plaintiffs
[could not] demonstrate that they have standing because [they] do not clarify which products
they purchased or which product representations, if any, they read or actually relied upon,"
reasoning that the plaintiffs "state that they purchased Ester–C, . . . note the different types of
Ester–C products available for consumer purchase, and . . . list several examples of the types of
Ester–C product representations that plaintiffs assert they relied upon in making their purchases,"
and concluding that the "[d]efendants' call for greater specificity here better falls to their
challenges on Rule 9(b) grounds, not to their arguments as to standing." (citations omitted)).

<u>ii.  Representations Plaintiff May Not Have Seen Prior to Purchase</u>

Defendant's second argument—that Plaintiff lacks standing to sue based on representations that he never saw, (Def.'s Mem. 17–19)—is more interesting, albeit also insufficient.  Somewhat more specifically, Defendant takes issue with the Complaint to the extent that Plaintiff sues for statements found on Defendant's website and in advertisements that he does not allege that he saw.  (*Id.* at 18.)[14]  Although unexplored by the Parties, the issue surrounding whether Plaintiff at this stage may maintain claims relating to representations or Product features that he did not see turns on whether that issue implicates (a) Plaintiff's Article III standing which "must be decided before the merits," *All. For Envtl. Renewal*, 436 F.3d at 87, or (b) class standing, which is "often considered at the class certification stage of the litigation," *Reid*, 2016 WL 403497, at *4.

"[T]here is some 'tension' in [the Supreme Court's] case law as to whether 'variation' between (1) a named plaintiff's claims and (2) the claims of putative class members 'is a matter of Article III standing or whether it goes to the propriety of class certification pursuant to Fed. R. Civ. P. 23(a).'" *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 160 (2d Cir. 2012) (alterations omitted) (quoting *Gratz v. Bollinger*, 539 U.S. 244, 263 & n.15 (2003)); *see also In re Frito-Lay N. Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *12 (same). Although the difference between Article III standing and class standing "looks straightforward and one would expect it to be well settled; neither assumption is entirely true." *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 768 (1st Cir.

---

[14] Defendant also includes the argument concerning the look and smell of the bacon in this part of its Memorandum of Law.  (*See* Def.'s Mem. 18–19).  To the extent Defendant's argument concerns the specific varieties of the Products that Plaintiff did buy, those claims have been considered in the previous section.

2011).  Nevertheless, in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, the Second Circuit explored the border between the two doctrines.  *See* 693 F.3d 145 (2d Cir. 2012). In that case, the plaintiff brought a putative class action alleging violations of the Securities Act of 1933 over certain mortgage-backed certificates, which were sold in 17 separate offerings through 17 separate trusts, and using 17 separate prospectus supplements, albeit all pursuant to the same shelf registration statement.  *See id.* at 148–49.  Each certificate represented a different tranche of its offering, and each tranche paid a different rate of interest depending on the expected time to maturity and the degree to which that tranche was protected against the risk of default.  *Id.* at 150.  The district court concluded that the plaintiff, who purchased certificates from just two of the trusts, lacked standing to bring certain claims on behalf of purchasers of certificates from any of the 15 trusts, reasoning that the plaintiff had not shown that the injuries were the same as those allegedly suffered by purchasers of the other certificates backed by distinct sets of loans.  *Id.* at 154.

Reversing, the Second Circuit articulated a new test for class certification, concluding that "in a putative class action, a plaintiff has class standing if he plausibly alleges" two things: First, that "he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant," and, second, that "such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants."  *Id.* at 162 (alterations and internal quotation marks omitted).  In so doing, the Second Circuit was unconcerned that the important differences among the offerings and tranches imperiled the plaintiff's Article III standing and, with it, the federal courts' jurisdiction.  To the contrary, the Second Circuit reasoned that the plaintiff "ha[d] Article III standing to sue [the] defendants in its own right" because the plaintiff had "plausibly alleged (1) a diminution in the

value of the [certificates that it purchased] (2) as a result of defendants' inclusion of misleading statements in the [corresponding] registration statements and associated prospectuses that is (3) redressable through rights of action for damages under [the Securities Act of 1933]." *Id.* at 158.[15]

In the context of post-*NECA-IBEW* consumer putative class actions, the relevant question then becomes what amount of variation among the disputed products or representations will threaten not just class standing but, indeed, Article III standing. One line of cases expresses apprehension as to whether a plaintiff may, consistent with Article III, maintain a putative class action over products that he or she did not purchase. *See, e.g.*, *Brady v. Basic Research, L.L.C.*, 101 F. Supp. 3d 217, 228 (E.D.N.Y. 2015) (noting that "[c]ourts are split as to whether plaintiffs have standing to assert claims relating to products they themselves did not purchase, but which are substantially similar to products they did purchase," and that "[s]ome federal courts have held, as a matter of law, that a plaintiff lacks standing to assert claims relating to products they did not purchase" (internal quotation marks omitted)); *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 541 (S.D.N.Y. 2013) (noting upon Rule 12(b)(1) motion that "[c]ourts are split as to whether plaintiffs have standing to assert claims relating to products they themselves did not

---

[15] Nevertheless, the Second Circuit was clear that the plaintiff's ability to assert claims on other investors' behalf as to certificates that the plaintiff had not purchased did not transmogrify the plaintiff's class standing into full-fledged Article III standing. Much the opposite, it concluded that the plaintiff "clearly lack[ed] standing to assert such claims on its behalf because it did not purchase those [c]ertificates." *NECA-IBEW*, 693 F.3d at 158; *see also Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 160 & n.5 (2d Cir. 2014) (noting same, but adding that, although "[the court] also rested this conclusion in part on the fact that the Securities Act grants so-called 'statutory standing' only to plaintiffs who have acquired the security at issue . . . , the Supreme Court has since clarified that 'statutory standing' involves the scope of the cause of action authorized by Congress and is not an element of standing under Article III" (citing *Lexmark*, 134 S. Ct. at 1387 & n.4)), *cert. denied*, 136 S. Ct. 796 (2016).

purchase, but which are substantially similar to products they did purchase."); *Jovel v. i-Health, Inc.*, No. 12-CV-5614, 2013 WL 5437065, at *10 (E.D.N.Y. Sept. 27, 2013) ("In cases where courts have held that plaintiffs may have standing to assert claims for unnamed class members based on products the plaintiffs themselves did not purchase, the critical inquiry seems to be whether there is sufficient similarity between the products purchased and not purchased." (internal quotation marks omitted)).  However, other courts have found this inquiry is best addressed at the certification stage.  *See Mosely v. Vitalize Labs, LLC*, No. 13-CV-2470, 2015 WL 5022635, at *7 (E.D.N.Y. Aug. 24, 2015) ("[C]ourts in th[e] [Second] Circuit have held that, subject to further inquiry at the class certification stage, a named plaintiff has standing to bring class action claims under state consumer protection laws for products that he did not purchase, so long as those products . . . are 'sufficiently similar' to the products that the named plaintiff did purchase."); *Ault v. J.M. Smucker Co.*, No. 13-CV-3409, 2014 WL 1998235, at *7 (S.D.N.Y. May 15, 2014) ("Whether the plaintiffs' injuries are sufficiently similar to those of the putative class members who purchased other products—and whether plaintiffs will therefore adequately represent the interests of the class—is a question the [c]ourt will consider on a Rule 23 certification motion." (internal quotation marks omitted)); *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *13 (same).[16]

---

[16] Although many courts grapple with the question of how much variation among products is permissible, the same analysis evidently applies in considering how much variation among specific representations is permissible.  *See, e.g.*, *Mosely*, 2015 WL 5022635, at *7 (noting that class standing may be established where "the false or deceptive manner in which [the products] were marketed[] are 'sufficiently similar' to the products that the named plaintiff did purchase); *Hidalgo*, 2015 WL 8375196, at *6 (rejecting the argument that the plaintiff did not have Article III standing to sue over advertisements other than the disputed product's labeling, including online advertisements, reasoning that "these arguments go to the scope of the putative class and thus, are [not] properly considered under . . . Rule 12(b)(1)"); *Bais Yaakov of Spring Valley v. Houghton Mifflin Harcourt Publishers, Inc.*, 36 F. Supp. 3d 417, 421 (S.D.N.Y. 2014) (applying *NECA-IBEW* to an advertisement).

In light of *NECA-IBEW*, the Court thinks it logical that Article III jurisdiction survives at least modest variation among those products purchased or representations seen by the named plaintiff on the one hand and the putative class members on the other.  *See, e.g.*, *Weisblum*, 88 F. Supp. 3d at 291 (concluding that, under *NECA-IBEW*, the plaintiffs had standing to sue over a particular product line, although they had purchased only the lozenges within that line). However, even assuming there is, somewhere, a line demarcating that permissible degree of variation between a plaintiff's claims and those of his putative class members from that quantum which destroys subject matter jurisdiction, *cf. In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 249 (D. Conn. 2015) ("Some kinds of variation are not fatal to Article III standing, and some kinds are."), the Court is satisfied that Plaintiff's claims here are on the safe side of that line; *cf. Reid*, 2016 WL 403497, at *5, *15 (concluding that the plaintiffs had Article III standing to sue over products that they did not purchase, but dismissing claims as to advertisements that they did not see, not for want of subject matter jurisdiction, but for want of sufficient particularity under Fed. R. Civ. P. 9(b)).[17]  Here, the differences between the advertisements that Plaintiff allegedly saw and those that he did not may be quite real—indeed, as Defendant points out, at least some of those advertisements expressly disclaim that the product is bacon.  (Def.'s Mem. 1.)[18]  And

---

[17] Not all courts seem to believe such a line necessarily exists.  *Cf. In re Frito-Lay N. Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *11 ("[O]nce there is at least one named plaintiff for every named defendant 'who can assert a claim directly against that defendant, . . . [Article III] standing is satisfied and only then will the inquiry shift to a class action analysis.'") (alterations in original) (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007)).

[18] The Court may consider these advertisements for purposes of resolving Defendant's Article III standing objection because such grounds for dismissal are brought pursuant to Rule 12(b)(1), not Rule 12(b)(6).  *See, e.g.*, *Carter*, 822 F.3d at 57 ("[A] defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the [p]leading.").

those arguments may be more than sufficient to undermine class standing at a later stage.  *See,*
*e.g.*, *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chi. v. Bank of N.Y. Mellon*,
775 F.3d 154, 163 (2d Cir. 2014) (finding no class standing where "[the] [p]laintiffs' claims d[id]
not implicate the 'same set of concerns' as those of absent class members who purchased
certificates issued by trusts in which no named [p]laintiff invested"), *cert. denied*, 136 S. Ct. 796
(2016); *see also DiMuro v. Clinique Labs., LLC*, 572 F. App'x 27, 29 (2d Cir. 2014) (finding the
plaintiff in a putative class action lacked class standing as to products that she did not buy where
they were not "nearly identical").  However, the Court cannot conclude that the variation
between the advertisements, even as described in Defendant's Memorandum of Law, are
meaningful enough to destroy subject matter jurisdiction—particularly when the Second Circuit
did not find variation in risk profiles, interest rates, maturity, and subordination sufficient to
warrant dismissal of a putative securities class action on Article III grounds in *NECA-IBEW*.  693
F.3d at 149, 159–60.  Therefore, Plaintiff's Article III standing is sufficient at this stage, even if
potentially subject to further scrutiny at a later stage.  *Cf. Tomasino v. Estee Lauder Cos.*, 44 F.
Supp. 3d 251, 255–56 & n.2 (E.D.N.Y. 2014) (noting the plaintiff's allegation that certain
advertisements "cite[d] 'in-vitro' tests," but that "[n]one of the advertisements that appear[ed] in
the [a]mended [c]omplaint mention in-vitro testing," and further dismissing the portion of the
complaint seeking injunctive relief on subject matter jurisdiction grounds without consideration
of whether it was lacking as to those ads).

### b.  What Remains of Defendant's Standing Arguments?

As noted, the source of Defendant's standing arguments was, initially, unclear, and, as
also noted, the Second Circuit distinguishes between Article III, statutory, and class standing.  To
the extent Plaintiff seeks to maintain claims for products he did not purchase or advertisements

he did not see, those will be addressed upon motion for class certification.  *See Ault*, 2014 WL

1998235, at *7 ("Whether the plaintiffs' injuries are sufficiently similar to those of the putative

class members who purchased other products—and whether plaintiffs will therefore adequately

represent the interests of the class—is a question the [c]ourt will consider on a Rule 23

certification motion." (internal quotation marks omitted)).  To the extent that Defendant seeks

dismissal for want of statutory standing, the Court notes that Defendant's primary argument

bears a striking resemblance to one of the elements of the claim that Plaintiff asserts.  *Compare*

Def.'s Mem. 16 (noting in standing section of brief that "New York state law . . . requires

plaintiffs to demonstrate, at a minimum, 'actual injury' resulting from their alleged purchases."

(citing *Stutman*, 731 N.E.2d at 612)) *with Stutman*, 731 N.E.2d at 611 (characterizing the

requirement that the plaintiff "suffered injury as a result of the deceptive act" as an "element" of

a G.B.L. § 349 claim).  Therefore, the Court will now turn to Defendant's Rule 12(b)(6) motion

to determine whether Plaintiff has stated a claim under G.B.L. § 349.

### 2.  Defendant's Rule 12(b)(6) Motion

Before considering Defendant's specific arguments as to Plaintiff's § 349 claims, the

Court must first consider whether it may take judicial notice of the documents and

advertisements that Defendant argues it should, and the general requirements to state a claim

under G.B.L. § 349.

### a.  What May the Court Consider?

In support of its position, Defendant urges the Court to consider certain documents

beyond the pleadings submitted at the same time as its Memorandum of Law.  As a general

proposition, "[i]n considering a motion under Fed. R. Civ. P. 12(b)(6) to dismiss a complaint for

failure to state a claim on which relief can be granted, [a] district court is normally required to

look only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F.3d 499, 509

(2d Cir. 2007).  However, "[i]f, on a motion under Rule 12(b)(6) . . . , matters outside the

pleadings are presented to and not excluded by the court, the motion must be treated as one for

summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  Nevertheless, in certain limited

circumstances, a court may consider documents besides the pleadings in deciding a motion to

dismiss.  For instance, "documents that are attached to the complaint or incorporated in it by

reference are deemed part of the pleading and may be considered." *Beauvoir v. Israel*, 794 F.3d

244, 248 n.4 (2d Cir. 2015) (internal quotation marks omitted); *Epstein v. N.Y.C. Dist. Council of*

*Carpenters Benefit Funds*, No. 15-CV-2866, 2016 WL 1718262, at *2 (S.D.N.Y. Apr. 28, 2016)

(same).  "To be incorporated by reference, the complaint must make 'a clear, definite and

substantial reference to the documents.'"  *McLennon v. City of New York*, — F. Supp. 3d —,

2016 WL 1089258, at *9 (E.D.N.Y. Mar. 18, 2016) (internal quotation marks omitted); *see also*

*Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*, No. 14-CV-7343, 2015 WL 5671724, at

*8 (S.D.N.Y. Sept. 22, 2015) (same).  Likewise, "'when a plaintiff chooses not to attach to the

complaint or incorporate by reference a document upon which it solely relies and which is

integral to the complaint,' the court may nevertheless take the document into consideration . . . ,

without converting the proceeding to one for summary judgment."  *Int'l Audiotext Network, Inc.*

*v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (alteration omitted) (quoting *Cortec Indus.,*

*Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991)); *see also Tekvet Techs., Co. v.*

*Crystaltech Web Hosting, Inc.*, No. 15-CV-7284, 2016 WL 1651848, at *2 (S.D.N.Y. Apr. 25,

2016) (same).  "To be integral to a complaint, the plaintiff must have (1) 'actual notice' of the

extraneous information and (2) 'relied upon the documents in framing the complaint.'"  *DeLuca*

*v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (alterations and some internal

quotation marks omitted) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.

2002)).  "[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint

is a necessary prerequisite to the court's consideration of the document on a dismissal motion;

mere notice or possession is not enough."  *Chambers*, 282 F.3d at 153 (emphasis in original)

(citing *Cortec*, 949 F.2d at 47–48).  Furthermore, "even if a document is 'integral' to the

complaint, it must be clear on the record that no dispute exists regarding the authenticity or

accuracy of the document," and "[i]t must also be clear that there exist no material disputed

issues of fact regarding the relevance of the document."  *DiFolco v. MSNBC Cable L.L.C.*, 622

F.3d 104, 111 (2d Cir. 2010) (some internal quotation marks omitted); *see also Faulkner v. Beer*,

463 F.3d 130, 134 (2d Cir. 2006) (same).

By the Court's count, Defendant requests that judicial notice be taken of several sources

of extraneous information, comprising the following:

Packaging
- The front and back views of the Beggin' Strips Bacon Flavor package.  (*See* Borders Decl. Ex. A; *see also* Def.'s Mem. 1, 2.)

- The front view of the Beggin' Collisions Bacon & Ranch Flavors package.  (*See* Borders Decl. Ex. B; *see also* Def.'s Mem. 2.)

- The front view of the Beggin' Strips Bacon & Cheese Flavors package.  (*See* Borders Decl. Ex. C; *see also* Def.'s Mem. 2, 11.)

Advertisements
- The television ad described in Plaintiff's Complaint at ¶¶ 13–15.  (*See* Def.'s Mem. 13.)

- Television ads run by Defendant, including those that expressly disclaim that the product is bacon.  (*See* Def.'s Mem. 13–15.)

Other Information
- Excerpts from the 2009 Official Publication of the Association of American Feed Control Officials Incorporated ("AAFCO") pertaining to the AAFCO Model Regulations for Pet Food and Specialty Pet Food.  (*See* Borders Decl. Ex. D; *see also* Def.'s Mem. 3.)

- An FDA webpage concerning the FDA's regulation of pet food.  (*See* Borders Decl. Ex. E; *see also* Def.'s Mem. 3 n.2.)

Of these, the Court concludes that it can consider the first and third packaging submissions—that is, Exhibits A and C to the Borders Declaration—and the first class of television ad, as all are "incorporated by reference" in the Complaint, in that the Complaint discusses each at length, (*see* Compl. ¶¶ 8–9, 13–15, 17–21), "mak[ing] a clear, definite and substantial reference to the [information],'" *McLennon*, 2016 WL 1089258, at *9 (internal quotation marks omitted).[19]  However, it cannot consider Defendant's other advertisements. This is so because, far from incorporating them by reference, *see McLennon*, 2016 WL 1089258, at *9, or being integral to the complaint through Plaintiff's actual notice of and reliance upon the ads in framing his complaint, *DeLuca*, 695 F. Supp. 2d at 60, Plaintiff describes only one advertisement and says that he "viewed *some* of Defendant's television commercials for the

---

[19] The Court concludes that there is no need to consider the last two classes of exhibits and so does not analyze whether the Court can take judicial notice of them.  Even if Defendant's packaging may have complied with federal, state, and model regulations, (*see* Def.'s Mem. 3), that does not force the conclusion that a reasonable consumer could not have been misled by Defendant's representations.  *Cf. Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288 (S.D.N.Y. 2014) ("[A] reasonable consumer might . . . focus on the more prominent portion of the product label that touts the product as 'Fat Free Milk and Omega–3s,' and overlook the smaller text that discloses the fat content on the front of the carton or the nutrition label."); *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *16 (concluding that the phrase "Made with ALL NATURAL ingredients" could still mislead a consumer into believing the product was GMO-free despite presence of a ring that also read "No MSG—No Preservatives— No Artificial Flavors"); *Ackerman*, 2010 WL 2925955, at *16 ("The fact that the actual sugar content of vitaminwater was accurately stated in an FDA-mandated label on the product does not eliminate the possibility that reasonable consumers may be misled.").  The Court also does not consider the content of the website, because, even though Plaintiff cites it, (*see* Compl. ¶ 11; Pl.'s Opp'n 2), he does not provide a printout or clarify when he accessed it.

products," (Compl. ¶ 9).[20]  With this issue resolved, the Court now turns to the merits of Defendant's Motion.

b.  The Merits of Plaintiff's GBL § 349 Claim

Apart from its contentions regarding standing, Defendant makes two arguments as to why Plaintiff fails to state a plausible claim for relief despite his invocation of G.B.L. § 349: (1) because his claim fails the "reasonable consumer" test, (Def.'s Mem. 6–15), and (2) because the advertising "constitute[s] nothing more than puffery," insufficient to deceive a reasonable consumer, (*id.* at 19–21).  It is unclear from the briefing, however, whether Defendant considers these to be doctrines that can deflate an otherwise valid § 349 claim, or rather grounds to conclude that Plaintiff's allegations do not state a plausible claim to relief in light of a G.B.L. § 349 claim's elements.  However, Defendant's statutory standing arguments, as noted, arguably implicate the elements of a § 349 claim.  Additionally, as will be discussed, the definition of one of the elements of a § 349 claim includes an inquiry into the effects of Defendant's actions on a reasonable consumer.  Therefore, for sake of ease and analytical purity, the Court considers Defendant's arguments as to statutory standing and the "reasonable consumer" test as an attack on Plaintiff's ability to state a plausible claim under § 349.  From there, the Court will consider whether the doctrine of puffery has any other effect on Plaintiff's claim.

---

[20] Arguably, there is something uncomfortable about the one-two punch of, on the one hand, allowing Plaintiff (for now) to proceed with his claims on behalf of putative class members concerning ads that he has not seen, but, on the other, suddenly going blind to those same ads in sizing up whether Defendant has unlawfully engaged in a "[d]eceptive act or practice" in contravention of New York General Business Law § 349.  Strange though that may seem, it is explained by the interplay between the class-standing and incorporation-by-reference doctrines. That said, the consideration of these other advertisements could be problematic for Plaintiff at the later stages of this case.

### i.  What Is Required to State a G.B.L. § 349 Claim?

Section 349 proscribes "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]," N.Y. Gen. Bus. Law § 349(a), and, further, provides a private right of action to "any person who has been injured by reason of any violation of th[e] section," *id.* § 349(h).  Although "[j]ustifiable reliance by the plaintiff is not an element of [a § 349] claim," *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 676 (N.Y. 2012), a plaintiff under that statute must ultimately "prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act," *Stutman*, 731 N.E.2d at 611; *see also Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014) (same); *Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP*, — F. Supp. 3d —, 2016 WL 791271, at *3 (S.D.N.Y. Feb. 27, 2016) ("To make out a prima facie case under [§] 349, a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." (internal quotation marks omitted) (quoting *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)).  Nevertheless, at the motion to dismiss stage, "an action under § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b) . . . , but need only meet the bare-bones notice-pleading requirements of Rule 8(a) . . . ." *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005).

With respect to the individual elements, to show that the defendant's conduct was consumer-oriented, a plaintiff "must demonstrate that the acts or practices have a broader impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995); *see also Koch v. Greenberg*, 626 F. App'x 335, 340 (2d

Cir. 2015) ("[C]onsumer-oriented conduct within the meaning of the NYGBL is broadly interpreted and requires merely that the conduct at issue have a broader impact on consumers at large." (internal quotation marks omitted)).  This will be so when "the acts [that a plaintiff] complain[s] of are consumer-oriented in the sense that they potentially affect similarly situated consumers."  *Oswego Laborers' Local 214 Pension Fund*, 647 N.E.2d at 745; *see also Koch*, 626 F. App'x at 340 ("So long as the conduct at issue can potentially affect similarly situated consumers, the requirement of consumer-oriented conduct is met." (internal quotation marks omitted)); *Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 359 (E.D.N.Y. 2014) ("'Consumer-oriented' has been defined in th[e] [Second] Circuit as 'conduct that potentially affects similarly situated consumers.'" (quoting *SQKFC, Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 636 (2d Cir. 1996))).  With respect to the second prong, "[d]eceptive practices are acts which are dishonest or misleading in a material respect," and "[d]eceptive acts are defined objectively as acts likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (alterations and internal quotation marks omitted); *see also Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (explaining that "[t]he New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" (quoting *Oswego Laborers' Local 214 Pension Fund*, 647 N.E.2d at 26)); *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003) ("[A] deceptive practice 'need not reach the level of common-law fraud to be actionable under [§] 349.'" (quoting *Stutman,* 731 N.E.2d at 612)); *Catalano*, 2016 WL 844832, at *15 (same). Finally, with respect to injury, "a plaintiff seeking compensatory damages must show that the material deceptive act or practice caused actual, although not necessarily pecuniary, harm."

*Catalano*, 2016 WL 844832, at \*15.  To that end, "deception and injury must be separately

pled," *Dimond v. Darden Rests., Inc.*, No. 13-CV-5244, 2014 WL 3377105, at \*9 (S.D.N.Y. July

9, 2014), and a § 349 claim is infirm where the alleged injury consists only of having been

deceived, *see Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 898 (N.Y. 1999) (rejecting as a

"flawed 'deception as injury' theory" the plaintiffs' assertion that "consumers who buy a product

that they would not have purchased, absent a manufacturer's deceptive commercial practices,

have suffered an injury under General Business Law § 349").

<u>ii.  Has Plaintiff Come Up Short?</u>

With this law in mind, Defendant's remaining arguments attack, if anything, Plaintiff's

ability to establish an injury within the meaning of § 349 claim, (*see* Def.'s Mem. 16–17), and

whether Defendant's representations were other than misleading in light of the objective

definition applied to § 349 claims, (*see id.* at 6–15).[21]

Just as the Court rejected the argument that Plaintiff was not injured by Defendant as an

Article III matter, that same contention likewise fails as a statutory matter under § 349.  Indeed,

in his Complaint, Plaintiff seeks monetary damages on the grounds that he "would not have paid

the premium price he paid" to buy the Products had he "known the truth."  (Compl. ¶ 9.)  Case

law makes clear that this is sufficient at the motion-to-dismiss phase for a § 349 claim to survive.

*See, e.g.*, *Singleton v. Fifth Generation, Inc.*, No. 15-CV-474, 2016 WL 406295, at \*10

(N.D.N.Y. Jan. 12, 2016) (finding that the plaintiff stated a claim under § 349 where the plaintiff

alleged that, had he "known 'the truth,'" he "would not have bought the vodka, or would have

---

[21] There is no real question that Defendant's alleged "acts or practices have a broader impact on consumers at large," *Oswego Laborers' Local 214 Pension Fund*, 647 N.E.2d at 744, inasmuch as the putative class has allegedly purchased the Products as a result of the marketing efforts at issue, (see, e.g., Compl. ¶ 3), and are, therefore, consumer-oriented.

paid less for it." (footnote and some internal quotation marks omitted)); *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288 (S.D.N.Y. 2014) (noting that "[the] [p]laintiffs claim that they paid price premiums specifically based on Defendants' misrepresentations, and allege that they deserve damages in the amount of either the purchase prices, or the price premiums, that they paid for Smart Balance" and accordingly finding that the Plaintiffs "adequately alleged injury under GBL § 349").

Whether Defendant's representations were misleading, however, is a much closer call. To be sure, ample case law exists allowing § 349 claims over allegedly deceptively labeled consumer goods to progress beyond the motion-to-dismiss stage, largely based on the view that the question of what might deceive the reasonable consumer is a question of fact. *See, e.g.*, *Singleton*, 2016 WL 406295, at *10 (vodka allegedly not handmade as marketed); *Stoltz v. Fage Dairy Processing Indus., S.A.*, No. 14-CV-3826, 2015 WL 5579872, at *4, *13–23 (E.D.N.Y. Sept. 22, 2015) (Greek yogurt allegedly deceptively labeled as "Total 0%" so as to suggest lack of calories, carbohydrates, and other qualities); *Silva v. Smucker Nat. Foods, Inc.*, No. 14-CV-6154, 2015 WL 5360022, at *10 (E.D.N.Y. Sept. 14, 2015) (root beer deceptively marketed as, among other things, natural); *Paulino v. Conopco, Inc.*, No. 14-CV-5145, 2015 WL 4895234, at *1, *5–6 (E.D.N.Y. Aug. 17, 2015) (personal care products marketed under the name "Suave NATURALS" but which allegedly contained unnatural and synthetic ingredients); *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 478–82 (S.D.N.Y. 2014) (personal care products labeled as "Active Naturals" but containing synthetic ingredients); *Koenig*, 995 F. Supp. 2d at 287 (milk products labeled "fat free" despite addition of omega-3 oil blend); *Ackerman v. Coca-Cola Co.*, No. 09-CV-0395, 2010 WL 2925955, at *6, *22–23 (E.D.N.Y. July 21, 2010) (beverage marketed in a manner to focus attention on purported health

benefits and away from high sugar content).  However, Defendant also cites ample case law dismissing similar claims as being unlikely to deceive a reasonable consumer in the context of lawsuits brought pursuant to other consumer protection statutes.  *See, e.g.*, *Workman v. Plum Inc.*, 141 F. Supp. 3d 1032, 1035–37 (N.D. Cal. 2015) (dismissing claims over allegedly misleading depiction of food groups on bars and puree pouches); *Jou v. Kimberly-Clark Corp.*, No. 13-CV-3075, 2013 WL 6491158, at *10 (N.D. Cal. Dec. 10, 2013) (dismissing claim to the extent that the plaintiff claimed that diapers labeled "Soft Organic Cotton" would likely mislead a reasonable consumer into believing the diapers were made exclusively of that material); *Pelayo v. Nestle USA, Inc.*, 989 F. Supp. 2d 973, 978 (C.D. Cal. 2013) (pasta products marketed as "all natural"); *Manchouck v. Mondelez Int'l Inc.*, No. 13-CV-2148, 2013 WL 5400285, at *2 (N.D. Cal. Sept. 26, 2013) (dismissing claim that Newton cookies were deceptively marketed to contain fruit because they contain fruit puree), *aff'd*, 603 F. App'x 632 (9th Cir. 2015); *Henderson v. Gruma Corp.*, No. 10-CV-4173, 2011 WL 1362188, at *1, *12 (C.D. Cal. Apr. 11, 2011) (dismissing claim over guacamole advertised as having been made "[w]ith [g]arden [v]egetables" as the guacamole contained vegetables that could be grown in a garden); *Werbel v. Pepsico, Inc.*, No. 09-CV-4456, 2010 WL 2673860, at *3–5 (N.D. Cal. July 2, 2010) (dismissing claims over berry and nutritional fruit content of "Cap'n Crunch's Crunch Berries" cereal); *McKinnis v. Kellogg USA*, No. 07-CV-2611, 2007 WL 4766060, at *3–5 (C.D. Cal. Sept. 19, 2007) (dismissing claims over the name, shape, and representations on the box of Froot Loops cereal).[22]

---

[22] Although Plaintiff does not press the point, these cases, at least initially, look distinguishable in that they do not involve § 349 but rather California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, and/or California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*  However, the same reasonable consumer test is applied to both UCL and CLRA claims, *see Pelayo*, 989 F. Supp. 2d at 977

In this respect, the Court believes there is a basic divide between (1) the representations on the packaging and television campaign and (2) the representations on the website.  With respect to the latter, Plaintiff's *sole* allegation is that "Defendant, on its Purina products webpage for the Beggin' product line, lists, under the heading 'Ingredients & Nutrients,' 'Made with real bacon.'  No other ingredients or nutrients are specified."  (Compl. ¶ 11.)  This statement is true, and no reasonable consumer would take this comment in isolation to mean that bacon was the sole or one of the main ingredients.  *See Henderson*, 2011 WL 1362188, at *12 (granting motion to dismiss claiming reasoning that the phrase "With Garden Vegetables" "does not claim a specific *amount* of vegetables in the product, but rather speaks to their presence in the product").

With respect to the other representations, however, the Court cannot hold as a matter of law that no reasonable consumer would be misled.  As a point of departure for considering why this is so, it is helpful to consider that this case is not one where a plaintiff is claiming that he thought there was an ingredient in the product he purchased when there was not—were it, Plaintiff's claim may well have been cooked.  *See Werbel*, 2010 WL 2673860, at *4 ("[T]he Crunch Berries—which are not fruit—are described as a 'SWEETENED CORN & OAT CEREAL' and shown as brightly-colored balls of cereal that no reasonable consumer would believe are made from real berries."); *McKinnis*, 2007 WL 4766060, at *1 ("The ingredients listed on the side panel of the [Froot Loops] box make clear that the cereal contains no actual

---

("Claims made under [the CLRA and UCL] are governed by the 'reasonable consumer' test which focuses on whether 'members of the public are likely to be deceived.'" (citing *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008)), and a number of cases have analyzed the "reasonable consumer" under these California statutes at the same time and in the same manner as § 349, *see, e.g.*, *Albert v. Blue Diamond Growers*, No. 15-CV-4087, 2015 WL 9450579, at *5 (S.D.N.Y. Oct. 21, 2015); *Paulino*, 2015 WL 4895234, at *4–7; *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *15–16; *Ackerman*, 2010 WL 2925955, at *15–17.  Therefore, the weight of authority seems to suggest that California's "reasonable consumer" inquiry can properly inform New York's.

fruit."). Similarly, with respect to the commercials and the packaging, this is also not a case where the plaintiff is suing over a product's claim to contain an ingredient that it, in fact, does contain, but where the product merely notes the presence of that ingredient, *see Henderson*, 2011 WL 1362188, at *12 (granting motion to dismiss reasoning that the phrase "With Garden Vegetables" "does not claim a specific *amount* of vegetables in the product, but rather speaks to their presence in the product"), or where the product expressly notes how much of the ingredient it contains, *McKinniss v. Sunny Delight Beverages Co.*, No. 07-CV-2034, 2007 WL 4766525, at *4 (C.D. Cal. Sept. 4, 2007) ("[I]t is undisputed that [the] Defendant's packaging truthfully identifies that each of its products contains 2% or less of concentrated orange, tangerine, apple, lime, or grapefruit juice."). Nor is it a case where the plaintiff maintains that he thought the contested ingredient was the product's only ingredient. *Cf. Jou*, 2013 WL 6491158, at *10 ("Contrary to [the] [p]laintiffs' contentions, the phrase 'Soft Organic Cotton' does not in any way connote that the entire diaper is made of only that material.")[23]

Rather, the crux of Plaintiff's claim is that he and the other putative class members believed the Products—marketed under a heavily branded bacon-oriented theme—were "predominantly made out of real pork bacon," (Compl. ¶ 20; Pl.'s Mem. of Law in Opp'n to Def.'s Mot. To Dismiss Compl. ("Pl.'s Opp'n") 6 (Dkt. No. 25)), when, in fact, "bacon and bacon fat a[re] the tenth and twelfth ingredients," (Def.'s Mem. 16), out of nearly two-dozen ingredients, (Compl. ¶ 19). Plaintiff allegedly gleaned this impression from the Products' scent

---

[23] Less helpfully for Plaintiff, this is also not a case where a plaintiff is suing because he thought there was *not* an ingredient in the product that, in fact, was present. *See Paulino*, 2015 WL 4895234, at *4–6 (noting that the "plaintiffs allege[d] that [the defendant] misled consumers that its [p]roducts were 'Naturals,'" when, "[i]n reality, they were not 'Naturals' because they contained numerous unnatural, synthetic ingredients").

and appearance, (Compl. ¶ 9), the television commercial campaign's repeated references to "bacon," or, perhaps, "beggin'," (*id.* ¶ 14), and the package's prominent depiction of bacon, (*id.* ¶¶ 17–18).[24]  On this set of facts, the Court cannot conclude Plaintiff has not plausibly alleged that Defendant's conduct was "misleading in a material way," *Stutman*, 731 N.E.2d at 611—particularly when, as a general proposition, "[t]he question of whether a business practice is deceptive in most cases presents a question of fact not amenable to resolution on a motion to dismiss," *Pelayo*, 989 F. Supp. 2d at 978.  Indeed, to accept Defendant's argument would be to conclude not that no reasonable consumer would believe there was bacon in the product (there was), but, with far more nuance, that no reasonable consumer would believe there to be quite so much.  If the Court could say as a matter of law that a reasonable consumer knows enough about what goes into dog food to conclude that, whatever its ingredients, bacon could not be a predominant ingredient, dismissal may well be appropriate.  *See Red v. Kraft Foods, Inc.*, No. 10-CV-1028, 2012 WL 5504011, at *3 (C.D. Cal. Oct. 25, 2012) (dismissing a claim regarding a "Vegetable Thins" product's claim to be "made with real vegetables," reasoning that "[t]he fact remains that the product is a box of crackers, and a reasonable consumer will be familiar with the fact of life that a cracker is not composed of primarily fresh vegetables").  But for a product like dog food, the Court is skeptical that the gradient between correctness and unreasonableness is so steep.  Indeed, if it cannot be decided as a matter of law that a reasonable customer would not be

---

[24] Defendant cites *Hairston v. S. Beach Beverage Co.*, No. 12-CV-1429, 2012 WL 1893818, at *5 (C.D. Cal. May 18, 2012) to argue that no reasonable consumer would be misled by a primary display panel that does not contain an actual affirmative misrepresentation where the ingredient is consistent with that display panel.  (*See* Def.'s Reply 8.)  However, *Hairston* explained that, in that case, "to the extent there is any ambiguity [on the main portion of the product's label], it [was] *clarified* by the detailed information contained in the ingredient list." 2012 WL 1893818, at *5 (emphasis added).  Here, the Court cannot say that the Products' inclusion of bacon and bacon fat somewhere near the middle of the pack in the ingredient list renders Plaintiff's claim implausible.

misled by a yogurt being marketed as "Total 0%" despite the presence of calories, *Stoltz*, 2015 WL 5579872, at *20–21, this Court cannot decide that a reasonable consumer would be deceived by Defendant's packaging and advertisement.

Nevertheless, it bears emphasizing that the question is, to be sure, a close one, and had Plaintiff alleged that he saw the advertisement that featured the tagline "Dogs Don't Know It's Not Bacon," (Def.'s Mem. 1), the Court doubts that this motion would be decided the same way. And the Court also recognizes that, faced with similar questions, different courts have come to different conclusions. *Compare Blue Buffalo Co. v. Nestle Purina Petcare Co.*, No. 15-CV-384, 2015 WL 3645262, at *1, *7 (E.D. Mo. June 10, 2015) (declining to conclude under the Lanham Act that a reasonable consumer would not believe bacon to be among the main ingredients in Beggin' Strips) *with Workman*, 141 F. Supp. 3d at 1037 (rejecting the notion that a reasonable consumer could be misled under California law by depictions of "'a heaping mound of [G]reek yogurt,' 'a mound of quinoa,' and 'plenteous quantities of pumpkin'" into believing that "those ingredients were the primary ingredients in the puree pouch[es] or fruit bar[s]" at issue when the primary ingredient in many of the products was applesauce, which the packaging did not depict).[25]  On balance, the closeness of the question militates against concluding—at least with respect to the packaging and commercials—that this is one of those "rare situation[s] in which granting a motion to dismiss is appropriate" with respect to the issue of whether a reasonable consumer would be misled by representations about a product.  *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008).  Of course, discovery may well yield a different conclusion at summary judgment.

---

[25] Violations under the Lanham Act, 15 U.S.C. § 1125(a), and § 349 claims "are governed by the same standards." *Buffalo News, Inc. v. Metro Grp., Inc.*, No. 12-CV-808, 2013 WL 321578, at *1–2 (W.D.N.Y. Jan. 28, 2013) (internal quotation marks omitted)

### iii.  Were the Representations Puffery?

Defendant's final argument is that the challenged statements "constitute nothing more than puffery, and puffery cannot plausibly deceive a reasonable consumer."  (Def.'s Mem. 19.)  With respect to the packaging, Defendant maintains that "BacoNology" is not a real word, and the name "Beggin'" and reference to "bacon flavor" make clear that the Product, if anything, is meant to imitate bacon.  (*Id.* 19–20.)  Similarly, Defendant maintains that the "exaggerated nature of the commercial" makes clear that its representations are mere puffery.

"Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language."  *Chobani, LLC v. Dannon Co.*, — F. Supp. 3d —, 2016 WL 369364, at *8 (N.D.N.Y. Jan. 29, 2016) (internal quotation marks omitted) (quoting *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993)), *reconsideration denied*, 2016 WL 1664908 (N.D.N.Y. Apr. 26, 2016).  As a general proposition, "[p]uffery is not actionable under [§] 349." *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 309 F. Supp. 2d 401, 405 (E.D.N.Y. 2004) (citing, inter alia, *Lacoff v. Buena Vista Publ'g, Inc.*, 705 N.Y.S.2d 183, 191 (Sup. Ct. 2000)); *see also In re Scotts EZ Seed Litig.*, No. 12-CV-4727, 2013 WL 2303727, at *11 (S.D.N.Y. May 22, 2013) ("[The] plaintiffs' Section 349 and 350 claims based on nonactionable puffery are dismissed as to all defendants."); *Leonard v. Abbott Labs., Inc.*, No. 10-CV-4676, 2012 WL 764199, at *21 (E.D.N.Y. Mar. 5, 2012) ("If an alleged misrepresentation would not deceive a reasonable person because it is vague or amounts to mere puffery or opinion, then a claim under the consumer protection statutes *may* be dismissed, as a matter of law, on a motion to dismiss." (citing *Lacoff*, 705 N.Y.S.2d at 191)).[26]  Although the Second Circuit has "had little occasion to

---

[26] That, however, may be subject to some debate.  *See James v. Penguin Grp. (USA) Inc.*, No. 13-CV-2801, 2014 WL 1407697, at *10 & n.2 (S.D.N.Y. Apr. 11, 2014) ("[a]ssuming that the puffery doctrine applies to a GBL § 349 claim," and explaining that the only New York

explore the concept of puffery in the [Lanham Act] false advertising context," *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007), "[p]uffery includes generalized or exaggerated statements which a reasonable consumer would not interpret as a factual claim upon which he could rely," *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 644 (S.D.N.Y. 2011), *reconsideration granted in part on other grounds*, 2011 WL 5121068 (S.D.N.Y. Oct. 28, 2011).[27]  In particular, courts have held that "vague statements of a product's superiority are non-actionable puffery," *Elkind*, 2015 WL 2344134, at *13 (citing *Time Warner Cable*, 497 F.3d at 160); *see also Avola v. La.-Pac. Corp.*, 991 F. Supp. 2d 381, 392 (E.D.N.Y. 2013) (positing that puffery turns on such factors as the "vagueness," "subjectivity," and "inability to influence . . . buyers' expectations").  Likewise, "[r]egarding puffery, the Second Circuit has stated that 'subjective claims about products, which cannot be proven either true or false, are not actionable.'"  *Fink*, 810 F. Supp. 2d at 644 (alterations omitted) (quoting *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995)).

With these propositions in mind, the Court is not convinced that Defendant's statements can be written off as mere puffery at this stage.  The bacon content of Defendant's product is not a "[s]ubjective claim[] . . . which cannot be proven either true or false," *Lipton*, 71 F.3d at 474,

---

authority cited by the defendants—*Lacoff*, 705 N.Y.S.2d at 191—is a First Amendment speech case that, in turn, cited a case that characterized puffery as non-actionable under *common law* fraud).

[27] While § 349 proscribes deceptive acts and practices, it is G.B.L. § 350 that, by its terms, makes false advertising unlawful.  *Compare* N.Y. Gen. Bus. Law § 349 *with* § 350.  However, because a Lanham Act claim and a § 349 claim share important similarities, *see Buffalo News, Inc.*, 2013 WL 321578, at *1, *2 (asserting that Lanham Act and § 349 claims "are governed by the same standards" (internal quotation marks omitted)); *cf. also RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14-CV-6294, 2015 WL 5008762, at *4 (S.D.N.Y. Aug. 24, 2015) (acknowledging that there may be analytical overlap between counterclaims asserted under GBL §§ 349 and 350 and Lanham Act), the Second Circuit's exploration of puffery in the false advertising context is, at least, a useful signpost.

nor is it a "vague statement[] of a product's superiority," *Elkind*, 2015 WL 2344134, at *13. Rather, if it is a statement that, as already decided, the Court cannot hold as a matter of law for § 349 purposes was not "misleading in a material way," *Stutman*, 731 N.E.2d at 611, the Court similarly cannot conclude that the package's reference to "BacoNology" or the commercial's comedic nature compels a different conclusion now that the issue is cast as one of puffery. While "a cartoon dog salivating while reaching for a crispy piece of bacon" or a reference to "BacoNology," (Def.'s Reply 9), may be "playful and absurd," that fact alone does not convert such representations into nonactionable puffery when, as here, "[l]iteralness is not what these commercials are about," *Verizon Directories Corp.*, 309 F. Supp. 2d at 407.  Therefore, the Court declines to dismiss Plaintiff's § 349 claim at this stage of the case on the grounds that the allegedly misleading information is mere puffery.[28]

---

[28] One issue which will no doubt be the subject of further inquiry is what Plaintiff means when he alleges that he was deceived into thinking the Products are made "primarily" or "largely" of bacon.  (Compl. ¶¶ 14, 15.)

### III. Conclusion

For the foregoing reasons, the Court denies Defendant's Motion to Dismiss, except with respect to the representations on the website, as to which the Court grants the Motion. The Clerk of the Court is respectfully requested to terminate the pending Motion. (*See* Dkt. No. 22.)

SO ORDERED.

Dated:      August 11 , 2016
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

44